IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CARPENTERS COMBINED FUND, INC., *by James R. Klein, Administrator*, | ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. 13-1287 |
| v. | ) ) | |
| JOHN LUCCI, and THOMAS VELOTTA, | ) ) | |
| Defendants. | ) | |

| | | |
|---|---|---|
| LABORERS' COMBINED FUNDS OF WESTERN PENNSYLVANIA, | ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. 13-1288 |
| v. | ) ) | |
| JOHN LUCCI, and THOMAS VELOTTA, | ) ) | |
| Defendants. | ) | |

## OPINION AND ORDER

**KELLY, Chief Magistrate Judge**[1]

Plaintiff Carpenters Combined Funds, Inc. ("the Carpenters Fund") and Plaintiff
Laborers' Combined Funds of Western Pennsylvania ("the Laborers Fund") (collectively
"Plaintiffs" or "the Funds") filed these related actions against John Lucci ("Lucci") and Thomas
Velotta ("Velotta") for recovery of certain unpaid fringe benefit contributions and related
interest, liquidated damages and attorneys' fees pursuant to the Employee Retirement Income
Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001, *et seq.*

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c)(1), the parties have voluntarily consented to have a United
States Magistrate Judge conduct proceedings in this case, including the entry of a final judgment. (ECF Nos. 18, 19).

Presently before the Court are the Motions for Summary Judgment against Defendant Velotta filed by Plaintiffs. ECF No. 39.[2] For the following reasons, both motions will be denied.

## I.    PROCEDURAL BACKGROUND

### A.    The Carpenters Fund Action

The Carpenters Fund brought its action at Civil Action No. 13-1287 under ERISA for fringe benefit contributions related to work performed by carpenters during the period from 2012 to 2013, which all were due and owing to the Carpenters Fund by Concrete Restoration Services, LLC ("CRS" or "Concrete Restoration Services") by virtue of a collective bargaining agreement ("CBA") and trust agreements incorporated therein. See C.A. No. 13-1287: ECF No. 3 (generally) and ¶ 3. The Carpenters Fund seeks to hold Velotta liable under ERISA, alleging that he was an ERISA fiduciary during the relevant time period regarding the fringe benefit payments due.

### B.    The Laborers Fund Action

Plaintiff Laborers Fund brought essentially the same action at Civil Action No. 13-1288[3] under ERISA for fringe benefit contributions related to work performed by Laborers for CRS between 2012 and 2013. See C.A. No. 13-1288: ECF No. 3 (generally) and ¶ 16. As the principal payments regarding the laborers' work have been paid and are no longer outstanding, the Laborers Fund now only seeks to hold Velotta liable under ERISA for payment of the remaining unpaid liquidated damages, interest, and attorneys' fees. See ECF No. 42-1 (Affidavit of Botsford, Administrator Laborers Fund).

---

[2] The filings relative to summary judgment in these related matters are virtually identical and are filed at the same docket numbers. Thus, the Court's reference to a particular docket number pertains to both cases.

[3] The only differences between the two cases are the names of the plaintiff administrators, the names of the funds, and the amounts due and owing.

Plaintiffs also brings a state law claim for conversion at Count II seeking recovery for amounts they claim were withheld from workers' wages for union dues and legislative funds ("political action committee" or "PAC" contributions) but not remitted to the Funds. See ECF No. 3, ¶¶ 19-25.

Both of these matters were stayed until February 26, 2015 at the request of Plaintiffs. ECF Nos. 28, 29. On April 8, 2016, counsel for Velotta filed a motion to withdraw as counsel in both cases, which the Court granted. ECF No. 34, 35. Velotta has since been proceeding *pro se*.

### C.    Motions for Summary Judgment

On January 9, 2017, Plaintiffs each filed a Motion for Summary Judgment against Velotta with Brief in Support, ECF Nos. 39, 40,[4] arguing that they are entitled to summary judgment on the ERISA claim against Velotta for breach of fiduciary duty based on the contention that Velotta was a fiduciary under ERISA either by virtue of his position at CRS, or alternatively, under a theory that Velotta Company and CRS constituted a "single employer" and Velotta would be liable with respect to Fund assets representing the work performed by laborers and contractors for CRS by virtue of his position at Velotta Company. Plaintiffs' Motions do not mention Count II, although that count is briefly addressed in the supporting briefs. Plaintiffs filed Concise Statements of Material Facts in support of their Motions, ECF No. 41, with separate Appendices. ECF No. 42. On January 30, 2017, Velotta filed Responses in Opposition, ECF No. 44, disputing certain of the Material Facts asserted by Plaintiffs, namely: 1) that Velotta is a personally liable "fiduciary" under ERISA during the relevant time period for which the

---

[4] On July 5, 2016, the Carpenters Fund and Lucci jointly filed a consent judgment in C.A. No. 13-1287, which the Court entered by order July 6, 2016. ECF No. 37, 38. Similarly, on July 11, 2016, the Laborers Fund and Lucci jointly filed a consent judgment in C.A. No. 13-1288, which the Court entered by order July 12, 2016. ECF Nos. 37, 38.

Funds seek payment, as Velotta contends he was not an officer or employee of CRS during the relevant time period and thus did not then have authority or control over CRS payments to the Funds; and 2) that Velotta Company is a "single employer" with CRS, as Velotta maintains the two were maintained as separate legal entities.  In opposition, Velotta relies on the record as contained within Plaintiffs' Appendices.  On February 13, 2017, Plaintiffs filed replies in support of their motions for summary judgment, ECF No. 45, arguing that because the *pro se* defendant failed to file a separate response to each of their Concise Statement of Material Fact as required by the rules, the stated facts should be deemed admitted.  Velotta responded with motions to strike the replies as untimely, ECF No. 47, which the Court denied.  ECF No. 52.  Plaintiffs' motions for summary judgment are now ripe for resolution.

## II.     STANDARD ON SUMMARY JUDGMENT

In deciding a summary judgment motion under Federal Rule of Civil Procedure 56, a court must view the facts in the light most favorable to the nonmoving party and must draw all reasonable inferences, and resolve all doubts in favor of the nonmoving party.  Matreale v. New Jersey Dep't of Military & Veterans Affairs, 487 F.3d 150, 152 (3d Cir. 2007); Woodside v. Sch. Dist. of Phila. Bd. of Educ., 248 F.3d 129, 130 (3d Cir. 2001).  Rule 56 specifically provides that: "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Thus, summary judgment is warranted where, "after adequate time for discovery and upon motion . . . a party . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Marten v. Godwin, 499 F.3d 290, 295 (3d Cir. 2007) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)).

A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law.  Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986); Gray v. York Newspapers, Inc., 957 F.2d 1070, 1078 (3d Cir. 1992).  An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  Anderson, 477 U.S. at 257; Brenner v. Local 514, United Brotherhood of Carpenters and Joiners of America, 927 F.2d 1283, 1287-88 (3d Cir. 1991). When determining whether there is a genuine issue of material fact, the court must view the facts and all reasonable inferences in favor of the nonmoving party.  EEOC v. Allstate Ins., 778 F.3d 444, 448 (3d Cir. 2015).

Ordinarily, the movant bears the initial burden of demonstrating that there is an absence of evidence to support the non-moving party's case.  Celotex Corp. v. Catrett, 477 U.S. at 322.  See Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 140 (3d Cir. 2004).  "W]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."  Scott v. Harris, 550 U.S. 372, 380 (2007) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)).   If the nonmoving party bears the burden of proof at trial and fails to make a sufficient showing on any essential element of its case, the moving party is entitled to judgment as a matter of law.  Celotex, 477 U.S. at 323.

Where, as here, however, the moving parties -- Plaintiffs -- bear the burden of proof on each element of their claims, succeeding on their motions for "affirmative" summary judgment can prove a more difficult but not insurmountable task because "the standard is more stringent."

Nat'l State Bank v. Fed. Reserve Bank, 979 F.2d 1579, 1582 (3d Cir. 1992). The moving

Plaintiffs:

> [b]ear[] the burden of proof on [their ERISA and conversion claims]. "After all, the burden of proof includes the obligation to persuade the factfinder that one's propositions of fact are indeed true. Thus, if there is a chance that a reasonable factfinder would not accept a moving party's necessary propositions of fact, pre-trial judgment cannot be granted. Specious objections will not, of course, defeat a motion for summary judgment, but real questions about credibility, gaps in the evidence, and doubts as to the sufficiency of the movant's proof, will."

Wallace v. Nat'l Indem. of Mid-Am., No. 14-1253, 2016 WL 6948781, at *3 n.2 (W.D. Pa. July

8, 2016) (quoting El v. Se. Pa. Transp. Auth. (SEPTA), 479 F.3d 232, 238 (3d Cir. 2007)).

Plaintiffs must convince the Court that they have met this exacting standard on every essential

element of their claims. As the United States Court of Appeals for the Third Circuit further

explained in Nat'l State Bank, "where the movant bears the burden of proof at trial and the

motion does not establish the absence of a genuine factual issue, the district court should deny

summary judgment *even if no opposing evidentiary matter is presented*." 979 F.2d at 1582

(emphasis added) (citing Resolution Tr. Corp. v. Gill, 960 F.2d 336, 340 (3d Cir. 1992)).

## III. FACTS RELATIVE TO MOTIONS FOR SUMMARY JUDGMENT[5]

### A. Response to Plaintiffs' Concise Statement of Facts

At the outset, the Court must address the application of the Local Rules of this Court and

Plaintiffs' argument that the Concise Statement of Material Facts, ECF No. 41, to which Velotta

did not separately respond, is deemed admitted in all respects. ECF No. 45.

Local Civil Rule 56, sets forth the requirements for filings in summary judgment

motions. Local Civil Rule 56.B.1 requires the movant to file a separate concise statement of

material facts citing "to a particular pleading, deposition, answer to interrogatory, admission on

---

[5] The facts are taken from the undisputed evidence of record, including Plaintiffs' Concise Statements of Material Facts as supported by the record, evidence not properly disputed on the record, and the disputed evidence of record viewed in the light most favorable to Velotta, the nonmoving party. See Anderson, 477 U.S. at 255.

file or other part of the record supporting the party's statement, acceptance, or denial of the material fact." LCvR 56.B.1. In response, the opposing party is required to provide a separately filed concise statement admitting or denying the facts in the moving party's concise statement, LCvR 56.C.1.a, setting forth the basis for a denial of the moving party's concise statement with reference to the record, LCvR 56.C.1.b, and providing any additional material facts that are necessary for the court's ruling on the motion. LCvR 56.C.1.c. Finally, Local Civil Rule 56.E provides that facts asserted as undisputed by either party "will for the purpose of deciding the motion for summary judgment be deemed admitted unless specifically denied or otherwise controverted by a separate concise statement of the opposing party." LCvR 56.E.

Although Velotta, proceeding *pro se*, did not provide a separate responsive Concise Statement of Facts as required by Local Rule 56.C.1, he did specifically indicate certain facts he vehemently disputes with citations to evidence in the record in his responsive briefs.

Considering the admonition of the United States Court of Appeals for the Third Circuit in Nat'l Bank regarding the standard on movants' motions, the Court will consider as contested the specifically challenged facts by Velotta where they are adequately supported by the record. The remaining statement of facts proffered by Plaintiffs, to the extent they are adequately supported by the record as required by Local Civil Rule 56.B.1 and are in accordance with the standards applicable to motions under Federal Rule of Civil Procedure 56, will be deemed admitted for purpose of the summary judgment motions in accordance with Local Civil Rule 56.E.

### B. Relevant Facts

The Carpenters Fund and the Laborers Fund are multiemployer fringe benefit funds that provide medical and retirement benefits to carpenters, laborers and their families. ECF No. 41 ¶

1.[6]  CRS was bound by the CBAs and their incorporated Trust Agreements entered into with the Carpenters Union and the Laborers Union.  ECF No. 41 ¶ 11.  See ECF No. 42-6 (Laborers CBA from 2008 to 2010); ECF No. 42-7 (Laborers CBA from 2010 to 2013); ECF No. 42-12 (Carpenters CBA from 2008 to 2010); ECF No. 42-13 (Carpenters CBA from 2011 to 2013). The CBAs require the timely payment of fringe benefit contributions and wage deductions to the Funds on a monthly basis with associated interest, liquidated damages and attorneys' fee due for failure to timely make required payments.  ECF No. 41 ¶ 11.  At some point, though the precise dates are never provided by Plaintiffs, Velotta Company also was a signatory to the CBAs with the Carpenters Union and the Laborers Union. ECF No. 42-22 at 55-56.  Velotta Company appears to have made its payments to the Fund as required by the CBAs, ECF No. 42-22 at 55-56, and is not a defendant in this action.

CRS failed to make certain principal contributions it owed to the Carpenters Fund for work performed from September 2012 to June 2013, ECF No. 3, ¶ 15, regarding which the Carpenters Fund seeks payment through Civil Action No. 13-1287.  According to the Carpenters Fund, the amount due and owing by CRS through December 31, 2016, including liquidated damages, attorney's fees, and interest for Count I totals $85,151.08.  ECF No. 42-14.[7]  Regarding Count II for conversion, the amount due and owing to the Carpenters Funds through December 31, 2016 for principal and interest totals $4,209.95.  ECF No. 42-14.

---

[6] The Court cites to Plaintiffs' Concise Statements of Material Facts as "ECF No. 41 ¶_."
[7] The Affidavit of James Malloy ("Mr. Malloy"), Auditor for the Carpenters Fund, incorporates a statement that purports to be "a breakdown of the amounts owed" to the Funds for work performed for CRS, but which provides only a breakdown of the total amounts as between Count I and Count II.  ECF No. 42-3, 42-14.  The Court also notes that the "breakdowns" provided by the Administrators of the Funds purport to state the amounts that Velotta owes the Funds for the work performed for CRS.  However, none of the labor contracts were between Velotta and either of the Funds, and the indication as to the amounts Velotta owes the Funds appears to be based solely on the legal argument offered that Velotta is an ERISA fiduciary regarding unpaid amounts owed by CRS.

As to the Laborers Fund, it is alleged in the Amended Complaint in Civil Action No. 13-1288 that CRS did not make payment for certain principal contributions it owed to the Laborers Fund for work performed from June 2012 through June 2013. ECF No. 3, ¶ 16. According to the Affidavit of Dawn Botsford, Administrator of the Laborers Fund, all of these principal payments were eventually made to the Laborers Fund, but amounts remain outstanding for interest, liquidated damages, and attorneys' fees. ECF No. 42-1, ¶ 2 ("Botsford Affidavit"). The remaining amount due and owing to the Laborers Funds by CRS through December 31, 2016, totals $218,809.41 under Count I pursuant to ERISA for interest, liquidated damages, and attorney's fees, ECF No. 42-8, and totals $13,386.19 for interest under Count II for conversion. ECF No. 42-8.[8]

### 1. Concrete Restoration Services ("CRS")

CRS is an Ohio Limited Liability Company that was started and originally owned by its two members, Lucci and his brother. ECF No. 42-22 at 18, 33. Subsequently, Velotta Company became part owner of CRS through a purchase of CRS equipment. ECF No. 42-22 at 34. According to the amended and restated operating agreement of CRS ("CRS Operating Agreement") dated January 1, 2006, signed by Lucci for himself and signed by Velotta on behalf of Velotta Company, Lucci and Velotta Company were then the two Members of CRS with Velotta Company owning 68 % of CRS and Lucci owning 32 %. ECF No. 42-22 at 28-29; ECF No. 42-18 at 2-3, 12, 15, 23-24. The CRS Operating Agreement also provided that if the members holding the majority of interest determined that additional funds were required to pay CRS operating costs, then the members shall contribute additional funds in proportion to their

---

[8] The Affidavit of Dawn A. Botsford of the Laborers Fund, as with Mr. Malloy's affidavit, incorporates a statement that purports to be "a breakdown of the amounts owed" to the Laborers Fund for work performed for CRS, but which provides only a breakdown between amounts claimed to be owed under Count I and Count II. The affidavit further indicates that the total provided represents amounts due beginning in August 2009 through December 2013, but does not breakdown any of the amounts as to time periods for which they are due.

interest. ECF No. 42-18 at 3. If a member is unable or unwilling to make a proportionate contribution, the contributing member could make the non-contributing member's proportionate contribution resulting in a loan from the contributing member. ECF No. 42-18 at 3 (emphasis added).

At one point, Velotta was an officer of CRS, serving as its Vice President. ECF No. 42-22 at 16-17. In his capacity as an officer of CRS, Velotta, amongst other things, assisted in estimating jobs, and was an additional signatory on CRS' checking account, ECF No. 42-22 at 19; ECF No. 42-24 at 6. Velotta, however, did not have any role in determining amounts of salary, wages, or fringe benefits of CRS employees, ECF No. 42-22 at 41, and did not sign any of the CRS employee paychecks which were all were signed with Lucci's signature using a signature stamp. ECF No. 42-24 at 5. Other details regarding Velotta's work for CRS are either not provided by Plaintiffs through record evidence or are disputed by Velotta's testimony. Lucci, who admittedly worked for CRS and whose signature was on all of CRS issued paychecks, received a CRS paycheck through December 2013, during the relevant time period. ECF No. 42-24 at 5.

The parties dispute the precise time period during which Velotta served as an officer of CRS and whether Velotta served as its Vice President or its President.[9] Velotta testified at his deposition that "at one time" he was a Vice President at CRS, ECF No. 42-22 at 16-17; that he was never the President, ECF No. 42-22 at 21; that he had check writing authority for CRS "a long time ago" and that Lucci had the check writing authority for CRS, ECF No. 42-22 at 19; that he resigned from CRS and quit the company having signed a resignation letter dated May 1,

---

[9] Interestingly, the original Complaints in both actions listed Velotta as President and Lucci as Vice President of CRS, but in the Amended Complaints filed in 2013, Plaintiffs allege that Velotta was Vice President and Lucci was President of CRS during the relevant time period. Compare C.A. No. 12-1287 ECF No. 1, ¶ 8 with ECF No. 3, ¶ 8; C.A. No. 12-1288 ECF No. 1, ¶ 9 with ECF No. 3, ¶ 9.

2008, and that, at the very least by October of 2010**,** he was no longer employed and had nothing to do with CRS, ECF No. 42-22 at 13, 16, 21, 25; and that he had not worked for CRS for at least "six, seven years" as of the date of his January 2017 deposition. ECF No. 42-22 at 25, 16.[10] Velotta explained that it was his signature on the May 1, 2008 resignation letter, but offered that given that the events occurred nearly a decade prior to his deposition he could not specifically recall handing the resignation letter to Lucci or telling Lucci of his resignation, but assumed that he had done so. ECF No. 42-22 at 22. His testimony supports that, at the very least sometime between May 1, 2008 and October of 2010, he ceased working for CRS and serving as its Vice President. ECF No. 42-22 at 21-22. Regarding his reasons for resigning from CRS, Velotta was able to recall that:

> [a]t that time, Velotta Company had some work in Pennsylvania and it needed 100 percent of my attention because things were going sour on some jobs, and I didn't like the way—I didn't like dealing with John Lucci and how he performed his work, and so I decided just to quit and get away from it.

ECF No. 42-22 at 43. After Velotta quit working for CRS, Velotta never took any personal action to take his name off of the signature card held at the bank for the CRS account.[11] ECF No. 42-22 at 31.

---

[10] Plaintiffs contest that Velotta resigned as an officer of CRS because: Velotta could not recall specifically informing Lucci of his resignation and delivering the resignation letter to Lucci; Lucci testified that Velotta did not resign; and Jody Meager, a Velotta Company employee, had filled out a form listing Velotta as an officer of CRS back in 2009. Thus, according to Plaintiff, Velotta's resignation was not effective and therefore he remained an officer of CRS during the relevant time period. Plaintiffs cite no legal authority and provide no analysis for the benefit of the Court regarding what specifically would be required to constitute an "effective resignation" such that a factfinder would be compelled to find Plaintiff remained an officer of CRS throughout the relevant time period. Moreover, in this Court's view, Velotta's testimony that he resigned as officer and that he no longer worked for CRS as of sometime between the 2008 resignation letter and at least by October of 2010, is sufficient to create an issue of fact regarding whether Velotta was an officer of CRS during the required time.

[11] Plaintiffs also assert as "fact" that because Velotta had check writing authority for CRS and did not remove himself from such authority after he supposedly quit, that he retained check writing authority during the relevant period and is a liable fiduciary as a result. Velotta admits that he had check writing authority for CRS at some point and that he did not act to take his name off of the signature card, ECF No. 44 at 4, but disputes that he was an employee or officer of CRS during the relevant period or that he ever signed CRS checks during the relevant time period. Indeed, Velotta points out that, after he resigned from CRS and no longer worked there, he would not have

### 2. Velotta Company

Velotta Company is an Ohio Corporation. ECF No. 42-21, ¶ 2. Robert Velotta, Defendant Velotta's uncle, was President of Velotta Company up until February of 2016. ECF No. 42-22 at 7, 8. As of 2012, Velotta, his father Michael Velotta, Carolann Velotta, and her father Robert Velotta were each 25% owners of the Velotta Company. ECF No. 41 ¶ 6; ECF No. 42-22 at 7, 30. Defendant Velotta served as Velotta Company's Vice President of Operations. ECF No. 41 ¶ 5. Carolann Velotta served as Velotta Company's Vice President of Finance, ECF No. 42-22 at 27, was responsible for signing the checks of Velotta Company and for maintaining its finances and financial records. ECF No. 42-22 at 36-37. She did not report to Defendant Velotta and he was not responsible for finances at Velotta Company. ECF No. 42-22 at 26, 35, 37.[12]

Jody Meager ("Meager"), was an employee of Velotta Company, ECF No. 42-22 at 38-39, who at one point filled out and signed an "employer survey" form provided by the auditor of the Laborers dated July 21, 2009, in which she listed herself as CRS' controller, see ECF No. 42-11 (indicating CRS as the correct name of "your company"), and listed that Velotta was President of CRS and Lucci was Vice President of CRS. Velotta, however, testified that he was never the President of CRS. ECF No. 42-22 at 21. Although Lucci indicated that Velotta was President of CRS and that he (Lucci) was the Vice President, Lucci admitted that at some point

---

any legal authority to sign CRS checks and notes the absence of any evidence in the record to show that he signed any CRS checks during the relevant time period and that the last check he signed was dated January 11, 2008. ECF No. 44 at 4. Also consistent with Velotta's testimony that he quit working for CRS, Plaintiffs have proffered no evidence of a CRS check written to Velotta for any work he performed for CRS during the relevant period. Rather, Plaintiffs rely solely on testimony of Lucci that Velotta was paid with a CRS check for work prior to that time period.

[12]When asked at his deposition if he had "signature authority with Velotta Company," Velotta responded "yes." ECF No. 42-22 at 20. There are various documents, such as certain notes, where Velotta signed on behalf of Velotta Company, but the questioning regarding his "signature authority" did not specify whether it was as to contracts, notes, bonds, or Velotta check writing authority, and Velotta was clear that he had nothing to do with Velotta Company finances. Nowhere do Plaintiffs directly assert that Velotta had check signing authority at Velotta Company, and such would be disputed on this summary judgment record.

Velotta switched to the position of Vice President of CRS but did not specify when. ECF No. 42-24 at 3.

It also appears that a signature stamp with Lucci's signature on it existed for use on CRS checks, which Meager, who had listed herself as controller of CRS, kept in her desk drawer in her office located at the Velotta Company. ECF No. 42-24 at 4. Velotta was unaware of the existence of this signature stamp and that Meager kept it. ECF No. 42-22 at 38, 39.[13]

### 3. Relationship Between CRS and Velotta Company

CRS and Velotta Company were both involved in the construction business, performed projects in Western Pennsylvania, and were "signed to" collective bargaining agreements with the Carpenters' Union and Laborers Union. ECF No. 41 ¶ 3; ECF No. 42-2, ¶¶ 2-3; ECF No. 42-4, ¶¶ 2, 3; ECF No. 42-22 at 9, 55; ECF No. 3, 16, ¶ 5. Both maintained a principle place of business at the same address, but in two separate offices. ECF No. 41 ¶ 4. In conducting Velotta Company business, the owners and principals of the Velotta Company, including Velotta, Robert Velotta and Carolann Velotta, would have in-house Velotta Company meetings from which Lucci, who was not an officer of Velotta Company, was excluded. ECF No. 42-22 at 9; ECF No. 42-24 at 3. Defendant Velotta would then only provide limited information from Velotta Company's corporate meetings to Lucci, who was an officer of CRS. ECF No. 42-24 at 3.

---

[13] The Funds contend that Velotta knew of the signature stamp because it was used on Velotta's employee paychecks from CRS. The Funds, however, have not provided copies of any stamp signed paycheck, much less a copy of such a paycheck for the time period for which payments to the Funds are sought. The Funds also appears to insinuate that because the signature stamp was located in Meager's desk drawer inside the Velotta Company's office that Velotta or someone at Velotta Company must have used it after Lucci claims he was laid off from CRS. Yet, Velotta denied knowing of the stamp and that it was stored in Meager's desk drawer. ECF No. 42-22 at 40. There is not even a scintilla of evidence in this record that Velotta used the stamp on any CRS checks, and Meager apparently had custody and control of it by virtue of it being stored in her desk drawer. The Funds' assertions on summary judgment on this and other matters require inappropriate speculation and inference drawn in their favor.

Other than Velotta, none of the other members of the Velotta family were officers of CRS. ECF No. 42-22.

Velotta signed certain notes for the Laborers and Carpenters Funds guaranteeing the payment by Velotta Company of CRS' debts to the Laborers and Carpenters Funds and specifically indicating that he did not sign the notes personally but in the capacity as Vice President of the Velotta Company. ECF No. 42-22 at 46. According to Velotta, Velotta Company was signatory to these notes because Velotta Company was a Member and part owner of CRS and had to sign certain indemnity agreements and bid bonds required for CRS to be hired onto construction projects. ECF No. 42-22 at 44, 47-48. One such project was a job CRS was to perform on a Squirrel Hill Tunnel project for which the contractor required a bond. ECF No. 42-22 at 47-48. A similar judgment note also was signed on behalf of the Velotta Company with the Carpenters Fund guaranteeing payment of other amounts owed by CRS. ECF No. 42-22 at 48.

At some point, Carolann Velotta mentioned to Velotta that the Velotta Company had to give some money to CRS for payment of CRS' bills that CRS was unable to pay. ECF No. 42-22 at 48. Lucci testified that he approached Velotta approximately 8 to 10 times for Velotta Company to pay certain of CRS' bills in order to keep the construction jobs that CRS was working on operating and, without providing further details, that somehow thereafter the bills were paid. ECF No. 42-24 at 6. Velotta, however, flatly denied at his deposition that he ever intervened on behalf of CRS to have Carolann Velotta pay any of CRS' bills on behalf of Velotta Company. ECF No. 42-22 at 50. Lucci did not specify over what time period the 8 to 10 requests and payments were made or what possible percentage of overall payments owed by CRS they represented. In 2014, some Velotta Company checks signed by Carolann Velotta were issued by Velotta Company to the Funds to make payment for CRS' liability to the Funds. ECF

14

No. 42-22 at 55-56. Velotta referred in his deposition to payments being made by Velotta Company for some of CRS' bills as loans from the Velotta Company and as necessary due to the bid bonds and judgment notes signed by Velotta Company. ECF No. 42-22 at 47-48, 54. Velotta never made calls to general contractors or owners on behalf of CRS to collect receivables due and owing to CRS and, after he resigned as Vice President of CRS, he was not involved in any bidding or estimating for CRS. ECF No. 42-22 at 50.

Velotta did not know when Lucci, who was a 32% owner of CRS, ceased working for CRS. Velotta also was unaware, because he no longer worked for CRS at the time, if Lucci eventually had been terminated from CRS, presuming that, as an owner, Lucci would have had to have terminated himself. ECF No. 42-22 at 31-32.[14]

### 4. CBA and Trust Agreement Provisions with Respect to Fund Assets

The Trust Agreements incorporated into the CBAs specifically address the status of amounts due and owing by an employer to the Funds. For example, the Trust Agreement and Pension Plan of the Laborers Fund states that:

> No Employer obligated to pay contributions shall have any right, title or interest to any sum payable by such Employer to the Fund, but not yet paid into the Fund. Title to all monies paid into and/or due and owing the Fund Shall be vested in the Fund and/or its Trustees.

ECF No. 42-9 at 4 (Laborers Fund Trust Agreement § 14); ECF No. 42-10 at 4 (Laborers Fund Trust Agreement and Pension Plan § 14) (same); ECF No. 42-15 at 2 (Carpenters Fund Agreement and Declaration of Trust at Appendix A, § 1) (same); ECF No. 42-16 at 2 (Carpenters Fund Agreement and Declaration of Trust Article XII, § 2) (same); ECF No. 42-17 at 2 (Carpenters Fund Annuity and Savings Fund Appendix A, § 1) (same).

---

[14] In an effort to show control or involvement by Velotta as an officer of CRS during the relevant time period, the Funds contend that Velotta fired Lucci from CRS in December of 2013. Velotta specified in his deposition, however, that he was unaware if Lucci was terminated from CRS because he himself no longer worked there at the time, thereby creating an issue of fact to be resolved at trial.

As further provided in the Trust Agreements, "[n]o Employer shall be responsible for the contributions or obligations of any other Employer, except as required by a collective bargaining agreement or other agreement or as provided for under applicable law." ECF No. 42-9 at 4 (Laborers Fund Trust Agreement § 13); ECF No. 42-10 at 4 (Laborers Fund Trust Agreement and Pension Plan § 13) (same); ECF No. 42-15 at 2 (Carpenters Fund Agreement and Declaration of Trust § 14) (same); ECF No. 42-16 at 2 (Carpenters Fund Agreement and Declaration of Trust Article XII, § 2) (same); ECF No. 42-17 at 2 (Carpenters Fund Annuity and Savings Fund Appendix A, § 1) (same).

## IV.    DISCUSSION

Based on review of the above-noted facts, there remain genuine issues of fact for resolution by the factfinder at trial. Many of Plaintiffs' assertions require the Court to inappropriately draw various inferences not in favor of Velotta but instead in favor of Plaintiffs -- the moving parties. Their position also requires the Court to "fill in" gaps in their evidence regarding the relevant time periods -- which is crucial for Plaintiffs to succeed on their claims. The Court, however, declines to do so and thus summary judgment is properly denied.

### A.    Claim for Breach of Fiduciary Duty under ERISA (Count I)

Count I is an ERISA collection claim. As observed by the United States Court of Appeals for the Third Circuit in Nat'l Sec. Sys., Inc. v. Iola, 700 F.3d 65 (3d Cir. 2012):

> Congress enacted ERISA to ensure the proper administration of pension and welfare plans, both during the years of the employee's active service and in his or her retirement years. Crafted to bring order and accountability to a system of employee benefit plans plagued by mismanagement, ERISA is principally concerned with protecting the financial security of plan participants and beneficiaries. To this end, the statute sets forth detailed disclosure and reporting obligations for plans and imposes various participation, vesting, and funding requirements.
> Relevant here, ERISA also prescribes standards of conduct for plan fiduciaries, derived in large part from the common law of trusts. Section 404

requires fiduciaries to discharge their duties "solely in the interest of the participants and beneficiaries ... with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity" would use. 29 U.S.C. § 1104(a)(1) . . . .

ERISA also aims to provide a uniform regulatory regime over employee benefit plans in order to ease administrative burdens and reduce employers' costs. . . . Congress . . . enumerate[d] a set of integrated civil enforcement remedies designed to redress violations of the statute or the terms of a plan.

Id. at 81–82 (internal quotations and citations omitted). See 29 U.S.C. § 1104(a)(1)(A)(i) (such a fiduciary is required to "discharge his duties with respect to a plan solely in the interests of the participants and beneficiaries . . . for the exclusive purpose of . . . providing benefits to participants and their beneficiaries.").

Here, the Carpenters Fund seeks to hold Velotta personally liable as a fiduciary under ERISA with respect to the obligations of CRS to make payments to the Fund for work performed by Carpenters from 2012 through 2013. The Laborers Fund seeks to hold Velotta personally liable on the same basis for untimely payments with regard to laborers during the period spanning from August 2009 to December 2013.[15]

ERISA provides for the personal liability of a fiduciary. As stated in Section 1109: "any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries [by ERISA] shall be personally liable to make good to such plan any losses to the plan resulting from each such breach . . . ." 29 U.S.C. § 1109(a). As urged by Velotta, ERISA also clarifies that "[n]o fiduciary shall be liable with respect to a breach of fiduciary duty under this subchapter if such breach was committed before he became a fiduciary or after he ceased to be a fiduciary." 29 U.S.C. § 1109(b).

---

[15] The Laborers Fund's Amended Complaint in C.A. No. 13-1288 referenced the time period of 2012 to 2013 but indicated that it was seeking additional amounts that may be revealed after audit. ECF No. 3, ¶¶ 15, 16. The amounts indicated in the summary filed with the Laborers Fund's Motion for Summary Judgment included amounts due identified as beginning from August 2009, but providing no other specificity. ECF No. 42-8.

To establish breach of a fiduciary duty in failing to remit fringe benefit contributions, Plaintiffs must demonstrate that Velotta was an ERISA fiduciary. Under ERISA:

> A person is a fiduciary with respect to a plan to the extent he exercises any discretionary authority or discretionary control respecting management of such plan or *exercises any authority or control respecting management or disposition of its assets.*

29 U.S.C. § 1002(21)(A) (emphasis added). Thus, in order to show that Velotta is personally liable under ERISA for the unpaid contributions sought by the Funds those contributions must have been plan assets, 29 U.S.C. § 1002(21)(A), Laborers Combined Funds of W. Pa. v. Cioppa, 346 F. Supp. 2d 765, 770 (W.D. Pa. 2004), and Velotta must have exercised control or authority over the management or disposition of those plan assets, PMTA-ILA Containerization Fund v. Rose, No. 94-5635, 1995 WL 461269, at *4 (E.D. Pa. Aug. 2, 1995); Cioppa, 346 F. Supp. 2d at 770, at the relevant time. 29 U.S.C. § 1109(b).

### 1.    Plan Assets

Velotta does not appear to dispute that the amounts due and owing by CRS to the Funds for the fringe benefit payments, including interest, liquidated damages, and attorneys' fees, are ERISA plan assets. Nor can he.

The Court must strictly consider the language of the Trust Agreements to determine if the unpaid contributions constitute ERISA "plan assets." Roofers Local 30 Combined Welfare Fund v. Lentz McGrane, Inc., No. 03-4187, 2005 WL 425582, at *3 (E.D. Pa. Feb. 21, 2005) (citing Galgay v. Gangloff, 677 F. Supp. 295, 301 (M.D. Pa. 1987), *aff'd*, 932 F.2d 959 (3d Cir. 1991)). Where the operative agreement contains language to the effect that that any payments "due and owing" or "accrued" to a fund are vested in that fund, then those payments due and owing constitute "plan assets" within the meaning of ERISA. Laborers' Combined Funds of W. Pa. v. Molinaro Corp., Nos. 15-1455 & 15-1466, 2017 WL 635361, at *3 (W.D. Pa. Feb. 16, 2017);

Cioppa, 346 F. Supp. 2d at 768, 771; Galgay, 677 F. Supp. at 301-302; Laborers' Combined

Funds of W. Pa. v. Parkins, Nos. 01-79 & 01-80, 2002 WL 31435287, at *3 (W.D. Pa. Jun. 5,

2002); Rose, 1995 WL 461269, at *4; Connors v. Paybra Mining Co., 807 F. Supp. 1242, 1244

(S.D.W. Va. 1992).

> In this case, albeit with minor variations, the Trust Agreements provide that:

> No Employer obligated to pay contributions shall have any right, title or interest
> to any sum payable by such Employer to the Fund, but not yet paid into the Fund.
> Title to all monies paid into and/or due and owing the Fund Shall be vested in the
> Fund and/or its Trustees.

See ECF No. 42-9 at 4 (Laborers Fund Trust Agreement § 14). This provision not only refers to

monies "due and owing" but the language is strikingly similar to the operative trust language in

Molinaro, Cioppa, Galgay, Parkins, Rose, and Connors, wherein it was found that the fringe

benefit payments due and owing to the funds involved therein constituted ERISA "plan assets"

based on the language in the applicable trusts and agreements. See Molinaro, 2017 WL 635361,

at *4 ("No Employer obligated to pay Contributions shall have any right, title, or interest to any

sum payable by such Employer to the Fund, but not yet paid into the Fund. Title to all monies

paid into and/or due and owing the Fund shall be vested in the Fund and/or its Trustees." and

"No contributing employer shall have any right, title or interest to any sum payable by such

Employer to the Fund, but not yet paid into the Fund. Title to all monies paid into and/or due

and owing such Fund shall be vested in the Trustees of such Fund."); Cioppa, 346 F. Supp. 2d at

768, 771 ("Title to all monies paid into and/or due and owing the Fund shall be vested in the

Fund and/or its Trustees."); Galgay, 677 F. Supp. at 301 ("Title to all the monies paid into and/or

due and owing said fund shall be vested in and remain exclusively in the trustees of the fund.");

Parkins, 2002 WL 31435287, at *3 ("Title to all monies paid into and/or due and owing such

Fund shall be vested in the Trustees of such Fund."); Rose, 1995 WL 461269, at *4 ("Title to all

of the money . . . paid into, acquired by, or accrued to the fund shall be vested in and remain exclusively in the board of trustees of the fund."); and Connors, 807 F. Supp. at 1244 ("Title to all the monies paid into and/or due and owing to the Trusts specified in this Article shall be vested in and remain exclusively in the Trustees of those Trusts.").

Thus, like in Molinaro, Cioppa, Galgay, Parkins, Rose, and Connors, the language used in the Carpenters and Laborers CBAs and Trust Agreements indicate that once CRA's obligation to contribute to the Carpenters Fund and Laborers Fund arose, the contributions owed were not simply receivables of the Funds if unpaid but instead became ERISA plan assets at the time these amounts became due. Molinaro, 2017 WL 635361, at *4; Galgay, 677 F. Supp. at 302 ("If the employer was delinquent in making such contributions, the unpaid monies were considered plan assets, and not merely receivables."). Title to the fringe benefit contributions owed by CRS vested to the Funds when those fringe benefit contributions and the associated interest, liquidated damages, and attorneys' fees became due and owing, and they were plan assets within the meaning of ERISA.

### 2. Authority and control regarding ERISA plan assets

Having found that the unpaid contributions at issue are "plan assets," the question of whether Velotta was a "fiduciary" within the meaning of ERISA, 29 U.S.C. § 1002(21)(A), turns on whether he had authority and control over the management or disposition of the due and owing fringe benefit contributions.

A corporate officer may be held personally liable for breach of ERISA fiduciary duties where he has any authority and control over ERISA plan assets and fails to ensure payment of plan assets due and owing to the relevant funds. See Srien v. Frankford Trust Co., 323 F.3d 214, 220-21 (3d Cir. 2003) (personal liability as ERISA fiduciary where individual has *any* authority

or control over the management or disposition of plan assets); Connors, 807 F. Supp. at 1247-48. Notably, under the portion of 29 U.S.C. § 1002(21)(A), only the authority or control over the management or disposition of plan assets, check writing authority will suffice under ERISA to create fiduciary status. "'Any' control over disposition of plan money makes the person who has the control a fiduciary," IT Corp. v. Gen. Am. Life Ins. Co., 107 F.3d 1415, 1421 (9th Cir. 1997), because "[t]he statute treats control over the cash differently from control over administration." Bd. of Trustees of Bricklayers & Allied Craftsmen Local 6 of N.J. Welfare Fund v. Wettlin Assocs., Inc., 237 F.3d 270, 274 (3d Cir. 2001) (quoting IT Corp., 107 F.3d at 1421)).

Here, in opposing the instant Motions for Summary Judgment, Velotta asserts that there is an issue of material fact as to whether he had the requisite authority or control over the plan assets at issue during the relevant time period, thereby precluding the entry of summary judgment in favor of Plaintiffs.[16] ECF No. 44 at 8. Indeed, Velotta testified unequivocally that, although he was Vice President of CRS at one time, he resigned from CRS, was no longer employed by CRS, and performed no work for CRS after October of 2010 at the latest and perhaps as early as 2008 when he signed his resignation letter. That Lucci testified that Velotta did not in fact resign and that Meager (decidedly not Velotta) filled out an employer survey provided by the Laborers' auditor and listing Velotta as "President" of CRS and John Lucci as "Vice President," may be evidence, if ultimately admissible, in support of a finding that Velotta was President of CRS on July 21, 2009 and beyond. However, it does not establish as a matter of law that Velotta was an officer of CRS with authority or control over plan assets during the relevant time period, much less for the entire relevant time period. An issue of fact therefore remains as to what time period and what position as officer of CRS, if any, Velotta held during the relevant time.

---

[16] He also asserts that he is entitled to be dismissed from this action, ECF 44 at 9, but filed no motion of his own.

Plaintiffs also make much of the fact that Velotta had check writing authority for CRS at one point and did not remove his signature authority from bank records after he supposedly quit, arguing that, as a result, Velotta retained check writing authority during the relevant period and is rendered liable as an ERISA fiduciary with authority and control regarding disposition of plan assets that were owed but not remitted to the Funds. Velotta admits that he, at some point in time, had check writing authority for CRS and that he did not act to take his name off of the signature card. He disputes, however, that he was an employee or officer of CRS during the relevant period or that he ever signed CRS checks during the relevant time period. Moreover, Velotta makes the point that, after he resigned from CRS and no longer worked there, he would have had no legal authority to sign CRS checks even if a check with his signature would "clear" at the bank. ECF No. 44 at 4. He also points to the absence of any evidence of CRS checks in the record that he supposedly signed during the relevant time period, or quite frankly at all, further supporting his testimony that he no longer had the authority to sign CRS checks during the relevant time period. ECF No. 44 at 4. Indeed, it was Lucci, who remained employed by CRS through at least December 2013, whose signature was affixed to all CRS paychecks and not that of Velotta. In addition, there is no proffered evidence of a CRS check written to Velotta and signed by anyone for any work he performed for CRS during the relevant period which is also consistent with Velotta's testimony that he quit working for CRS. Furthermore, Plaintiffs offer no evidence to support their assertion that Velotta actually remained a signatory on CRS' bank account, much less that he was a lawful signatory on the account during the relevant time period

The Funds also point to the use of Lucci's signature stamp as evidencing that Velotta was a fiduciary. ECF No. 41 at 3, 7. Lucci testified that his signature stamp had been used on a check and official documents after he no longer worked for CRS. Plaintiffs insinuate that the

Velotta Company is responsible for the use of the signature stamp and that someone at Velotta Company must have used it because it was stored in Meager's desk at Velotta Company.[17] Even if evidence, as opposed to speculation, established that someone at Velotta Company used Lucci's signature stamp, the use without Lucci's permission and after he no longer worked at CRS does not tend to show that the individual who used the stamp "on behalf of Velotta Company" had lawful control over the disposition of CRS' funds. More importantly, it does not show that Velotta ever used it or had the right to use it. Indeed, Lucci himself testified that his signature stamp was used improperly on CRS checks without his authority after he was "laid off."[18] ECF No. 42-24 at 4-5.

Nor does Velotta's position as Vice President of Operations at the Velotta Company suffice to establish him as an ERISA fiduciary with respect to the relevant plan assets. Carolann Velotta was the Velotta Company Vice President of Finance, she did not report to Velotta and thus he did not have authority over her. Moreover, she was the one who signed Velotta Company checks and was responsible for Velotta Company finances. Nevertheless, the Funds contend that because Lucci spoke to Velotta in an effort to have CRS bills paid by Velotta Company (at an unspecified time) and that the bills were subsequently paid by Velotta Company, then Velotta "must have" had the authority to instruct Velotta Company to pay the CRS bills. ECF No. 41 at 7. This portended factual assertion is improperly based on speculation and inference in favor of the Funds. It also is a far cry from showing as a matter of law that Velotta was a fiduciary with respect to the plan assets related to the work performed by laborers and

---

[17] That Lucci's signature stamp was used after he claims he no longer worked at CRS is consistent with what Velotta testified to regarding his lack of action to ensure he no longer remained as a listed signatory at the bank after he quit working for CRS.

[18] It therefore appears that Lucci's signature remained on file at the bank and that he, just like Velotta, did not take action to remove his own signature as an authorized signature on the bank account despite maintaining he was no longer employed by CRS. Again, the fact that the bank would consider the signature authorized would not give either Lucci or Velotta lawful control and authority over CRS accounts when they no longer worked for CRS.

carpenters for CRS. Indeed, as Velotta aptly explained, Carolann Velotta would have had some of the CRS bills paid with Velotta Company assets because Velotta Company had signed a bond and even judgment note, and Velotta Company was a Member of CRS having an interest in making certain payments on CRS obligations and considering those payments a loan. This position is consistent with the CRS Operating Agreement, which references loans from a member under those circumstances. Again, the facts on summary judgment do not establish as a matter of law that Velotta was an ERISA fiduciary during the relevant time period as to the plan assets for work performed for CRS.

Finally, the Funds simply assume, but never explain or attempt to show with citation to legal authority, how Velotta's 25% ownership of the Velotta Company or his position of Vice President of Operations of the Velotta Company automatically renders him an ERISA fiduciary regarding the plan assets related to the work performed for CRS or just how this entitles them to summary judgment where they bear the burden of proof. That Velotta was an officer of CRS during the relevant time period remains in dispute and the contention that he had any authority and control over the plan assets by virtue of his signature being on file with the bank regarding the CRS account or by virtue of his position as Vice President of Operations for Velotta Company is a tenuous assertion at best and adequately disputed on this summary judgment record. Plaintiffs therefore have failed to point to evidence from which a reasonable factfinder could find that Velotta had the requisite authority and control over plan assets during the relevant time period and summary judgment as to Count I is properly denied.

**3.    Alternative single employer theory for Velotta's ERISA fiduciary liability**

Plaintiffs nevertheless contend that even if they are not entitled to summary judgment regarding Velotta's position as an officer at CRS with check signing authority, they are still

entitled to summary judgment based on a theory that Velotta Company and CRS were a single employer and that Velotta, as an officer of Velotta Company, is somehow liable under ERISA to the Funds for payments due and owing by CRS.  ECF No. 40 at 8.  In so arguing, Plaintiffs rely solely on <u>Stardyne, Inc. v. N.L.R.B</u>, 41 F.3d 141 (3d Cir. 1994), and <u>N.L.R.B v. Browning-Ferris Indus. of Pa., Inc.</u>, 691 F.2d 1117 (3d Cir. 1982) in support of their theory.  The problem with Plaintiffs' position is four-fold: 1) they fail to show how single employer theory applies in the context of ERISA; 2) single employer status is a question for the factfinder when considering the four relevant factors under all of the circumstances; 3) they offer a cursory analysis of the required factors viewed improperly in the light most favorable to themselves as the moving parties and ignore other salient and unfavorable facts counseling against single employer status; and 4) they fail to show as a matter of law how Velotta's position at Velotta Company rendered him an ERISA fiduciary as to the plan assets regarding work performed by carpenters and laborers for CRS.

<u>Stardyne</u> explains that the National Labor Relations Board ("NLRB") developed the alter ego and single employer theories in the face of vexing reorganizations utilized to evade National Labor Relations Act ("NLRA") obligations.  <u>Stardyne</u>, 41 F.3d at 146.

> The single employer doctrine generally applies to situations where two entities *concurrently* perform the same function and one entity recognizes the union and the other does not. In making a single employer determination, the Board uses four criteria: interrelation of operations, common management, centralized control of labor relations, and common ownership. The alter ego doctrine, by contrast, . . . usually comes into play when a new legal entity has *replaced* the predecessor (or at least the unionized portion of the predecessor).

<u>Id.</u> at 152 (internal citations omitted).  Under this doctrine, the fact-finder determines whether the two employers are in truth one enterprise, and if so, neither can avoid CBA obligations imposed by the NLRA.  <u>N.L.R.B. v. Al Bryant</u>, 711 F.2d 543 (3d Cir. 1983); <u>N.L.R.B. v. Browning-Ferris</u>

Indus., 691 F.2d 1117 (3d Cir. 1982); Bygott v. Leaseway Transp. Corp., 622 F. Supp. 774, 780 (E.D. Pa. 1985).

Notably, the Funds do not cite to an ERISA case applying this single employer and/or alter ego theory to create ERISA fiduciary liability of an officer of one company with respect to the plan assets involving the work performed for the other. Instead, they rely on two cases involving the appeal of decisions and orders of the NLRB, which is charged by Congress under the National Labor Relations Act ("NLRA") with the responsibility of interpreting and enforcing the Act and is empowered to make certain factual determinations in the labor disputes that come before it. In the cases relied upon by the Funds, the NLRB was called upon to make the factual determination as to whether the two employers involved should be treated as a single employer (Stardyne) or a joint employer (Browning-Ferris). See Browning-Ferris, 691 F.2d at 1122 (affirming the factual finding that the two employers were "joint employers" and articulating four factors to consider in determining whether two employers are a "single employer."). Thus, it is clear from these cases that the ultimate determination of whether the two nominally separate entities are one integrated enterprise -- a single employer -- is an issue of fact based on all of the circumstances. Browning-Ferris, 691 F.2d at 1122; Stardyne, 41 F.3d at 151.

Stardyne and Browning-Ferris stand for the proposition that if two companies are in reality an integrated enterprise then both companies would be bound by the same CBA. The cases do not address ERISA liability of an officer of one of those entities as a fiduciary with respect to work performed for the other. Importantly, the Funds do not argue that because these two companies should be considered a single employer, the Velotta Company is somehow liable under the CBAs. Rather, the Funds argue that because CRS and the Velotta Company should be considered a single employer, then the Vice President of Operations for Velotta Company --

Velotta, who is a 25% owner of the Velotta Company -- should be considered an ERISA fiduciary with respect to plan assets of the Funds regarding work performed by laborers and carpenters for CRS. Velotta's ERISA fiduciary liability, however, does not necessarily follow from any single employer status of CRS and Velotta Company and they offer no authority or analysis to support their position. Moreover, as Vice President of Operations at Velotta Company, Velotta was not responsible for Velotta Company financial matters -- that was the responsibility of Carolann Velotta, Velotta Company's Vice President of Finance.

Additionally, although not discussed by Plaintiffs, the Velotta Company itself was already a signatory to the CBAs with the carpenters and laborers unions and the Velotta Company paid the amounts it owed for the work of carpenters and laborers performed for the Velotta Company. Velotta Company therefore did not seek to avoid its obligations under the NLRA through use of two separate but really integrated entities. Thus, the justification for applying the single employer theory is not present here and Stardyne and Browning-Ferris upon which the Funds rely do not appear to be applicable.

Even if the Court were to find that the single employer theory applied to this ERISA matter, however, the Funds would still have to point to evidence showing that CRS and Velotta Company were a single employer during the relevant time period and that Velotta was a fiduciary with authority or control over the ERISA plan assets at the time.

The Funds do not seriously engage in an analysis of the single employer factors or consider the facts in the light most favorable to Velotta as required; instead they ignore salient and unfavorable evidence. Arguing that there is no genuine issue of material fact as to whether Velotta Company and CRS were a single employer, the Funds point to the following undisputed facts: both entities were involved in the construction business in Western Pennsylvania and

signed CBAs with the Carpenters and Laborers unions; both maintained their principal places of business at the same address; both used the same tax preparer, insurance companies, and banking institution; both shared the same billing and accounting software; both were listed by Meager as "related companies;" Velotta was an officer for both at one point; and Velotta also owned 25% of the Velotta Company. Two companies being "related" in some fashion, though a necessary proposition for single employer status, does not render the four factor "single employer" test satisfied.[19] Indeed, based on the record before the Court, it is unable to find that the four factors have been met and thus cannot say that Velotta Company and CRS were a single employer as a matter of law.

### a.  interrelations of operations

First, considering the interrelation of operations, the record shows that although the entities appear to have shared an address, field of industry, some common vendors, and some interrelated software programs, they each had their own computers, separate offices and separately maintained bank accounts. Moreover, when the owners of Velotta Company were discussing Velotta Company business they excluded Lucci as he was not an owner, officer, or employee of Velotta Company, thus maintaining separation between Velotta Company and CRS. Based on this record, which appears to be the extent of the evidence related to the operations of the two companies, the Court is unable to conclude that the companies were so interrelated that in reality they were one employer.

---

[19] Plaintiffs attempt to show the two companies were interrelated based on Lucci's testimony that Velotta directed Lucci and CRS regarding work of CRS on the Squirrel Hill Tunnel project for the contractor. ECF No. 42-24 at 4. Lucci testified that Velotta instructed CRS to stop working until a work order was issued, yet Velotta testified that he was not involved in the job and only had some meetings with the contractor as a representative of Velotta Company because Velotta Company had signed a bid bond for CRS to enable them to perform work on the project. ECF 42-22 at 45. The competing testimony presents another classic dispute of fact which precludes the Court from entering summary judgment in Plaintiffs' favor.

### b.     common management

With respect to common management, the principals of Velotta Company who managed it actively excluded Lucci who was President of CRS from Velotta Company business meetings as Lucci was neither an employee nor officer of Velotta Company, evidencing separation of the two entities.  Although Lucci and Velotta at one time appear to be the two who directly managed CRS when Velotta was Vice President, Velotta had resigned prior to the relevant time period and no longer worked for or managed CRS.  Velotta Company also operated with a Vice President of Operations and a separate Vice President of Finance, Carolann Velotta, who was responsible for signing checks with respect to the Velotta Company's bank account, whereas Lucci and Velotta, when he worked for CRS, had the check signing authority for CRS' bank account and Lucci's signature was affixed to all payroll checks.  The Velotta Company Vice President of Finance was not an officer or manager of CRS.  Velotta Company and CRS only had one officer in common, Velotta, but his position differed at Velotta Company where he was Vice President of Operations.  The Velotta Company had multiple other officers.  In sum, the management of both entities did not have so much in common that they appear to be a single entity.

### c.     centralized control of labor relations

There also is no evidence of a centralized control of labor relations.  As stated, Velotta Company was an independent signatory to the CBAs and Velotta Company paid its obligations regarding the work performed for it by laborers and carpenters.  Velotta testified that he "never dealt with any of the unions with CRS, Laborers or Carpenters or anybody else [CRS] used." ECF No. 42-22 at 45.  These facts, which the Funds fail to address, evidence that CRS and Velotta Company maintained separation in labor relations and not centralized control.

### d.     common ownership

Finally, as to common ownership, although at some point Velotta Company owned 68%
of CRS and Lucci owned 32% of CRS, CRS was started by and previously owned by Lucci and
his brother.  Velotta Company, on the other hand was owned by Velotta, Carolann Velotta, and
their fathers in equal shares of 25%.  In sum, on this record, the establishment of Velotta
Company and CRS as a single employer fails.

In addition, the Funds still would have to show that Velotta was a fiduciary with respect
to the plan assets related to the work performed by CRS to hold him personally liable.  As
indicated <u>supra</u>, there is a factual issue as to whether Velotta was such a fiduciary at the relevant
time by virtue of his position and work at CRS because he had resigned.

## B.  Conversion Claim (Count II)

The Funds only seek recovery for amounts withheld from workers' wages for union dues
and PAC contributions under a state law theory of conversion because "wage deductions for
union dues and political action contributions do not relate to an employee benefit plan within the
meaning of ERISA, and thus are not recoverable . . . under ERISA."  <u>Molinaro</u>, 2017 WL
635361, at *5 n.5 (citing <u>Cioppa</u> 346 F. Supp. 2d at 773-74; <u>Carpenters Combined Funds ex rel.
Klein v. Klingman</u>, No. 2:10-63, 2011 WL 92083, at *7 (W.D. Pa. Jan. 11, 2011)).

Under Pennsylvania law,

Conversion is the deprivation of another's right of property in, or use or
possession of, a chattel, without the owner's consent and without lawful
justification.  In Pennsylvania, under the "participation" theory, a corporate
officer who takes part in the commission of a tort by the corporation is personally
liable for that tort.

<u>Cioppa</u>, 346 F. Supp. 2d at 773 (internal citations omitted).  Courts have applied these
conversion and participation theories against an employer's officers in support of recovery of
required withholdings made by an employer for union dues and PAC contributions but never

paid over by the employer to the appropriate Funds.  See <u>Cioppa</u>, 346 F. Supp. 2d at 773;

<u>Parkins</u>, 2002 WL 31435287, at *5; <u>Klingman</u>, 2011 WL 92083, at *7; <u>Molinaro</u>, 2017 WL

635361, at *5.

In their Motions for Summary Judgment, Plaintiffs do not specifically mention the

conversion claim under Count II of the Amended Complaint, ECF No. 39, but they do indicate

that they seek summary judgment on the claim in their supporting briefs where they make

various bald assertions regarding Velotta's liability for conversion.  Argument and bald

assertions, however, are not evidence.  The sum and substance of their argument for summary

judgment on conversion is that Velotta is liable for conversion because: 1) certain deductions

were made from the CRS earned wages of laborer and carpenter employees for union dues and

PAC contributions to be paid to the Fund were withheld by CRS, but were never submitted to the

Fund; 2) the withheld amounts were property of Plaintiffs and not of CRS or Velotta; 3) Velotta

was an officer of CRS; and 4) Velotta had discretionary control over money held by CRS and

had the authority and responsibility to remit to the Funds on behalf of those carpenters and

laborers any monies withheld by CRS to be paid to the Funds.  ECF No. 40 at 5-6.

Velotta does not appear to dispute that CRS made withholdings from wages of carpenters

and laborers performing work for CRS that were to be paid to the Funds but were not remitted as

required.  As indicated <u>supra</u>, the question of whether Velotta was an officer of CRS during the

relevant time period remains in dispute.  Similarly, whether Velotta had authority and control

over CRS assets by virtue of his position as Vice President of Operations for Velotta Company is

not established on this record so as to render him liable for conversion.

Plaintiffs' reliance on <u>Cioppa</u> and <u>Parkins</u> is misplaced.  The Court in <u>Cioppa</u> determined

that that the individual who admittedly was the *sole* shareholder, director and officer of the

corporation that withheld wages for union dues and PAC contributions from that corporation's laborers but did not pay the withholdings to the Funds as required, was liable for conversion as a matter of law. Cioppa, 346 F. Supp. 2d at 773-774. See also Molinaro, 2017 WL 635361, at *5-6. In Parkins, the summary judgment record established that the individual sued was President of the corporation and also was personally responsible for directing the payment of all corporate expenses, but failed to turn over the withholdings. Parkins, 2002 WL 31435287, at *5.

Here, the record on summary judgment differs significantly. Velotta was not admittedly or otherwise the sole shareholder, officer or director of CRS or Velotta Company. Velotta disputes that he was an officer or employee of CRS at the relevant time, and furthermore Velotta testified that in his position for Velotta Company he was not responsible for any financial matters. Relevant and material issues of fact therefore remain related to this Count as well. Based on the foregoing, summary judgment in favor of the Funds and against Velotta on the claim for conversion is inappropriate and will be denied.

## IV.     CONCLUSION

Through what they offer as "facts" on summary judgment, Plaintiffs paint a picture of this case with a rather broad brush, making improper inferences and construing the facts and inferences in their own favor as the movants on summary judgment. Critical to their cases against Velotta is the remaining factual issue of when Velotta was an officer of CRS with check signing authority. Also, critical to their "alternative theory" of liability is that CRS and Velotta Company were a single employer during the relevant time period, which cannot be resolved on this record and its applicability remains doubtful. Finally, Plaintiffs must show that Velotta had the requisite authority or control over plan assets and required remittance to the Funds, which

they have failed to do. Therefore, Plaintiffs are not entitled to summary judgment. Accordingly, the following Order is entered:

## ORDER

AND NOW, this 13th day of September, 2017, upon consideration of Plaintiff Carpenters Combined Funds, Inc.'s Motion for Summary Judgment, Plaintiff's Brief in Support, Defendant Thomas Velotta's Brief in Opposition and Plaintiff's Reply Brief, IT IS HEREBY ORDERED that the Motion for Summary Judgment docketed at Civil Action No. 13-1287, ECF No. 39, is DENIED;

FURTHER, upon consideration of Plaintiff Laborers' Combined Funds of Western Pennsylvania's Motion for Summary Judgment, Plaintiff's Brief in Support, Defendant Thomas Velotta's Brief in Opposition and Plaintiff's Reply Brief, IT IS HEREBY ORDERED that the Motion for Summary Judgment docketed at Civil Action No. 13-1287, ECF No. 39, is DENIED.

BY THE COURT:


/s/ Maureen P. Kelly
MAUREEN P. KELLY
CHIEF UNITED STATES MAGISTRATE JUDGE


cc:     All Counsel of Record Via CM-ECF